O

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

WESTERN DIVISION

| | |
|---|---|
| EDWARD MELENDEZ, et al., | CV 08-2705 ABC (RZx) |
| Plaintiffs, | ORDER DENYING PLAINTIFFS' MOTION TO REMAND |
| v. | |
| HSI PRODUCTIONS, INC., et al. | |
| Defendants. | |

Pending before the Court is Plaintiffs Edward Melendez, James R. Maurer, Harry Bchakjian, and Joseph Baker's ("Plaintiffs'") Motion to Remand, filed on May 21, 2008.  Defendants HSI Productions, Inc. and Doron Kauper ("Defendants") opposed on June 2, 2008 and Plaintiffs replied on June 9, 2008.  The parties submitted additional briefing pursuant to the Court's June 19, 2008 Order.  The Court finds this matter appropriate for submission without oral argument and VACATES the August 11, 2008 hearing date.  See Fed. R. Civ. P. 78; Local Rule 7-15.  For the reasons indicated below, the Court DENIES Plaintiffs' motion to remand.

I.    **FACTUAL BACKGROUND**

Plaintiffs are drivers and transportation captains/gang bosses employed in the television commercial production industry in California and are employed by numerous independent television commercial production companies that provide services to advertisers and their agencies.  Defendant HSI is one of the largest television commercial production companies in Los Angeles County and employs Defendant Kauper as its head of production.  On November 7, 2007, Defendant Kauper distributed a memorandum to all production personnel at HSI (the "Kauper Memo") that stated in its entirety:

> HSI has fallen victim to grievances filed by Teamsters Local 399 due to our disregard for union regulations.  I'm sure our freelance production teams make best efforts to know these regulations and to comply with them.  For the most part, however, reliance is made on the services of our Gang Bosses to assure that Teamster drivers are utilized with strict adherence to the union contract.
>
> In a few cases, the Gang Bosses hired have not protected HSI's interests.  This leads me to list the following names as DO NOT HIREs.

Plaintiffs' names were then listed.

Based on this memorandum, Plaintiffs first filed grievances against Defendants for "blackballing" them, which were ultimately settled.  Plaintiffs then filed a civil suit over the Kauper Memo in California state court, claiming: (1) blacklisting in violation of Labor Code sections 1050, 1052; (2) defamation; (3) intentional infliction of emotional distress; (4) intentional interference with prospective economic advantage; and (5) negligent interference with prospective economic advantage.  Plaintiffs do not allege that they are members in the union to which the memorandum refers or that their employment is governed by a collective bargaining agreement called the "2005 Commercials Agreement" (the "CBA").  These facts, however, are

1  not disputed.

2     Defendants removed this case to federal court on April 24, 2008,

3  claiming that Plaintiffs' claims were preempted by section 301 of the

4  Labor Management Relations Act ("LMRA"), 29 U.S.C. § 185(a).

5  Plaintiffs now ask the Court to remand this case back to state court

6  because their claims are not preempted by the LMRA and no other basis

7  for federal jurisdiction exists.

8  **II.  LEGAL STANDARD**

9     The Court's subject matter jurisdiction depends on the preemptive

10 scope of the LMRA, a subject on which both the Supreme Court and the

11 Ninth Circuit have frequently spoken.  Section 301 "preempts state law

12 claims that are based directly on the rights created by a collective

13 bargaining agreement as well as claims that are substantially

14 dependent on an interpretation of a collective bargaining agreement."

15 Beals v. Kiewitt Pacific Co., 114 F.3d 892, 894 (9th Cir. 1997).

16 Preemption in this context therefore extends beyond breach of contract

17 claims arising directly under a CBA to state tort claims as well.  See

18 Allis-Chalmers Corp. v. Lueck, 471 U.S. 202, 210 (1985).  "[T]he key

19 to determining the scope of preemption is not how the complaint is

20 cast, but whether the claims can be resolved only by referring to the

21 terms of the collective bargaining agreement."  Tellez v. Pacific Gas

22 & Elec. Co., 817 F.2d 536, 537 (9th Cir. 1987) (citing Allis-Chalmers,

23 471 U.S. at 213).  The primary inquiry is "whether evaluation of the

24 tort claim is inextricably intertwined with consideration of the terms

25 of the labor contract."  Id.  "[W]hen the meaning of the terms of a

26 collective bargaining agreement are not disputed, the mere fact that a

27 collective bargaining agreement will be consulted in the course of

28 state law litigation does not require preemption."  Niehaus v.

1   Greyhound Lines, Inc., 173 F.3d 1207, 1212 (9th Cir. 1999).

2       An en banc panel of the Ninth Circuit has clarified the scope of

3   tort-claim preemption under section 301:

4           The plaintiff's claim is the touchstone for this analysis;
            the need to interpret the CBA must inhere in the nature of
5           the plaintiff's claim.  If the claim is plainly based on
            state law, § 301 preemption is not mandated simply because
6           the defendant refers to the CBA in mounting a defense. . . .
            [A]lleging a hypothetical connection between the claims and
7           the terms of the CBA is not enough to preempt the claims:
            adjudication of the claim must require interpretation of a
8           provision of the CBA.  A creative linkage between the
            subject matter of the claim and the wording of a CBA
9           provision is insufficient; rather, the proffered
            interpretation argument must reach a reasonable level of
10          credibility.

11  Cramer v. Consolidated Freightways, Inc., 255 F.3d 683, 691-92 (9th

12  Cir. 2001) (en banc).

13  **III. DISCUSSION**

14      **A.   Provisions of the CBA Implicated by the Kauper Memo**

15      Defendants have identified Articles I, V, X, XIII, and XXII of

16  the CBA as the subject of the Kauper Memo.  Article I recognizes that

17  the union is the exclusive bargaining representative of the member-

18  employees.  Article V is entitled "Transportation Captain/Gang Bosses"

19  and it addresses, among other issues, the Gang Bosses' duties and

20  responsibilities with respect to supervising union employees.

21  Subsection (c) of that Article states: "The Transportation

22  Captain/Gang Bosses shall (1) supervise all job classifications

23  covered under this Agreement, (2) clear with the Union all drivers and

24  location scouts/managers to be hired for a commercial (including

25  drivers and location scouts/managers to be hired after production has

26  started), and (3) supervise the parking of all rolling stock."

27  Defendants refer to a grievance allegedly resulting from Plaintiffs'

28  conduct cited in the Kauper Memo.  In that grievance, the union

alleged a violation of Article V because "[d]rivers names faxed to Union on day 3 of shoot."  Article V(c) requires names to be delivered within the first two hours of the first day of a shoot or within the first two hours after being hired if later than the first day of the shoot.

Another grievance provided by Defendants included violations of Article X, entitled "Preference of Employment (Industry Experience Roster)", which set various "Grouping Provisions."  The grievance alleges that three drivers where hired out of their "grouping" in violation of Article X.  Subsection (a) of Article X indicates that "preference of employment shall be given to individuals named on the Industry Experience Roster."  Subsections (b) and (c) appear to be exceptions to this rule.  Defendant Kauper explains that this Article provides "that the hiring of union employees is to be done according to various seniority grouping provisions for certain kinds of vehicles."  (Kauper Decl. ¶ 2.)  Neither the CBA nor Defendants describe the "Industry Experience Roster."  Appendix B to the CBA sets forth instances in which the Grouping Provisions need not be followed.

Article XIII deals with the type of equipment that must be operated by union members and Article XXII specifies the health, pension, and other benefit plans for employees covered by the CBA. These two provisions were also cited in the representative grievances provided by Defendants.[1]

---

[1] In their supplemental brief, Plaintiffs argue that some of the Plaintiffs were not subject to the grievances provided by Defendants because they acted properly under the CBA. These arguments go to the merits of Plaintiffs' claims, not whether their claims are preempted and the Court declines to consider them here.

**B.   Preemption of Plaintiffs' Claims**

The interpretation and application of Articles I, V, X, XIII, and XXII of the CBA – and any other provisions implicated by the Kauper Memo – are inextricably intertwined with determining Plaintiffs' state-law claims.  See Allis-Chalmers, 471 U.S. at 213.  As discussed in more detail below, a necessary element of all of Plaintiffs' tort claims is the falsity of the Kauper Memo.  Because the Kauper Memo accuses Plaintiffs of failing to properly enforce certain provisions of the CBA, the Court will unavoidably have to construe the CBA to determine whether the Kauper Memo's allegations were false, i.e., whether Plaintiffs did, in fact, enforce the terms of the CBA.  Cast in this light, the Court's duty in adjudicating Plaintiffs' tort claims is no different than its duty in adjudicating standard breach-of-contract claims under the CBA, which are unquestionably preempted by the LMRA.  The Court should not "elevate form over substance and allow parties to evade the requirements of § 301 by relabeling their contract claims" as tort claims.  Id. at 211.  In fact, Plaintiffs themselves believed that their claims arose under the CBA; they filed grievances to seek redress for the very blackballing they believe resulted from distribution of the Kauper Memo.  Plaintiffs' casting these allegations as tort claims cannot avoid LMRA preemption.

1.   Labor Code § 1050

Labor Code section 1050 states: "Any person, or agent or officer thereof, who, after having discharged an employee from the service of such person or after an employee has voluntarily left such service, by any misrepresentation prevents or attempts to prevent the former employee from obtaining employment, is guilty of a misdemeanor."  To state a claim, Plaintiffs must plead that: (1) after Plaintiffs'

1    employment with Defendants ended, Defendants made a representation to

2    prospective employers about Plaintiffs; (2) Defendants' representation

3    **was not true**; (3) Defendants knew the representation was not true when

4    they made it; (4) Defendants made the representation with the intent

5    of preventing plaintiffs from obtaining employment; (5) Plaintiffs

6    were harmed; and (6) Defendants' conduct was a substantial factor in

7    causing Plaintiffs' harm.  CACI 2711 (emphasis added).

8         Plaintiffs allege that Defendants violated section 1050 by

9    falsely representing that Plaintiffs did not protect HSI's interests

10   under the CBA, failed to assure that drivers were utilized in

11   conformance with the requirements of the CBA, and were unfit to be

12   employed as gang bosses.  Plaintiffs admit that the CBA is relevant to

13   this claim "to enable the fact-finder to assess the falsity of

14   Kauper's memo," but they claim this does not require preemption.  Yet

15   the Court cannot avoid evaluating the CBA in determining whether

16   Plaintiffs properly enforced its terms, and as a result, whether the

17   Kauper Memo was false.  Plaintiffs cannot rely on section 1050 to

18   circumvent the LMRA when the inquiry under that provision and the

19   determination that Plaintiffs failed to enforce the terms of the CBA

20   are inextricably intertwined.

21        Neihaus, on which Plaintiffs rely, is distinguishable.  In that

22   case, the plaintiff brought fraud and misrepresentation claims against

23   his union for failing to fulfill a promise that he could transfer from

24   management to a union position whenever he desired.  173 F.3d at 1212.

25   The court concluded that these claims were not preempted because the

26   parties did not dispute any of the terms of the CBA and, to determine

27   whether the plaintiff's reliance on these statements was justified,

28   the court merely needed to determine whether the plaintiff knew of the

1   CBA's terms.   Id.   Moreover, the plaintiff conceded that he had no

2   rights under the CBA.   Id.   Notably, the court appears not to have

3   considered the falsity prong of the fraud and misrepresentation

4   claims.   Here, unlike Niehaus, the Court must do more than simply

5   determine whether Plaintiffs knew of the CBA; it must determine

6   whether Plaintiffs properly enforced its terms.   This is the precise

7   sort of inquiry pulling this claim within the scope of the LMRA.   As a

8   result, Plaintiffs' section 1050 claim is preempted and federal

9   jurisdiction exists.

10              2.   Defamation

11      "Defamation is an invasion of the interest in reputation.   The

12   tort involves the intentional publication of a statement of fact that

13   is **false**, unprivileged, and has a natural tendency to injure or which

14   causes special damage."   Smith v. Maldonado, 72 Cal. App. 4th 637, 645

15   (1999) (emphasis added).   As in section 1050, to state a claim for

16   defamation, Plaintiffs must prove that Defendants' statements were

17   false.   Like Plaintiffs' section 1050 claim, Plaintiffs' defamation

18   claim compels the Court to determine whether Plaintiffs violated the

19   terms of the CBA.

20      Plaintiffs subtly shift focus from whether Plaintiffs failed to

21   ensure that drivers are utilized in conformance with the CBA to

22   whether "Defendants made a false statement that others understood to

23   mean that [P]laintiffs were unfit to be employed as drivers or

24   transportation captains/gang bosses in the television commercial

25   production industry." (Mot. at 8:24-26.)   Plaintiffs' "fitness" as

26   drivers or transportation captains/gang bosses is governed by the

27   terms of the CBA.   Thus, any determination of whether Defendants

28   truthfully or falsely implied that Plaintiffs were not fit to serve as

gang bosses requires the Court to determine whether Plaintiffs properly enforced the CBA.  If Plaintiffs properly enforced the CBA, they were "fit" for their positions and Defendants' memorandum was false.  Again, this determination directly turns on the Court's evaluation of the CBA.

Plaintiffs' reliance on <u>Tellez</u> is misplaced.  In that case, the plaintiff sued for defamation arising from a letter disseminated by his employer that accused him of buying cocaine on the job.  817 F.2d at 538.  The court first stated that "California's defamation law establishes nonnegotiable rights and obligations independent of any labor contract."  <u>Id.</u>  The court concluded that the CBA was not intertwined with the plaintiff's defamation claim because the CBA "neither requires management to send written notice of suspension nor provides guidelines in the event such notice is sent.  Thus, [the employer] could not have been acting under the terms of the collective bargaining agreement when he sent the suspension letter."  <u>Id.</u>  This case is distinguishable in two respects.  First, even if Defendants were not compelled by the CBA to send the Kauper Memo, the Kauper Memo still rests directly on Plaintiffs' proper or improper enforcement of its terms, not some other violation of state or federal law, such as the law in <u>Tellez</u>.  Second, in <u>Tellez</u>, the court did not address the truth or falsity of the suspension letter, only whether its issuance was compelled under the CBA.  Here, Defendants argue that the Kauper Memo's very subject springs from, and is inextricably linked to, the provisions of the CBA.  <u>Tellez</u> does not control this factual scenario.  Therefore, Plaintiffs' defamation claim must be preempted and federal jurisdiction over this claim exists.

1          3.   Intentional Infliction of Emotional Distress

2          Under California law, intentional infliction of emotional

3    distress requires: "(1) extreme and outrageous conduct by the

4    defendant with the intention of causing, or reckless disregard for the

5    probability of causing, emotional distress; (2) the plaintiff's

6    suffering severe or extreme emotional distress; and (3) actual and

7    proximate causation of the emotional distress by the defendant's

8    outrageous conduct." Christiansen v. Superior Ct., 54 Cal. 3d 868,

9    903 (1991) (citations omitted).  "Extreme and outrageous conduct" must

10   be evaluated in light of the relationship between the parties.  Alcorn

11   v. Anbro Eng'q, Inc., 2 Cal. 3d 493, 498 n.2 (1970).  The court in

12   Miller v. AT&T Network Systems, 850 F.2d 543 (9th Cir. 1988) concluded

13   that the plaintiff's intentional infliction of emotional distress

14   claim was preempted by section 301 of the LMRA and that decision

15   compels the same result here.  In that case, the plaintiff sued in

16   state court for disability discrimination and intentional infliction

17   of emotional distress.  Id. at 545.  Although the court did not

18   preempt the plaintiff's discrimination claim, it preempted the

19   plaintiff's emotional distress claim.  Like California law, Oregon

20   emotional distress law requires "inquiry into the appropriateness of

21   the defendant's behavior," so "the terms of the CBA can become

22   relevant in evaluating whether the defendant's behavior was

23   reasonable." Id. at 550.  "Actions that the collective bargaining

24   agreement permits might be deemed reasonable in virtue of the fact

25   that the CBA permits them." Id.  To make that determination, that

26   court would have to assess the "farthest reaches of socially tolerable

27   behavior," which "depends on the relationship between plaintiff and

28   defendant." Id. at 551.  The outrageousness of the plaintiff's

                                10

1  reassignment and dismissal in that case "could depend on whether the
2  behavior violated the terms of the CBA."  Id.  The court concluded
3  that, "[b]ecause the emotional distress claim requires consideration
4  of reasonableness of AT&T's behavior, which in turn could depend on
5  whether that behavior violated the collective bargaining agreement,
6  the claim is preempted."  Id.

7      Plaintiffs' intentional infliction of emotional distress claim
8  here is indistinguishable from Miller.  If the Kauper Memo was
9  justified under the CBA – if Plaintiffs had actually failed to enforce
10 the CBA's provisions – Defendants' conduct was not outrageous and
11 Plaintiffs cannot recover for emotional distress.  The boundaries of
12 socially tolerable behavior in this circumstance, therefore, are set
13 by the CBA and Plaintiffs' enforcement of its terms.  As the Ninth
14 Circuit concluded in Miller, Plaintiffs' emotional distress claim is
15 inextricably intertwined with consideration of the CBA.

16     Plaintiffs rely on Cramer v. Consolidated Freightways, Inc., 255
17 F.3d at 697, to suggest that, because section 1050 imposes criminal
18 penalties, their emotional distress claim arises from outrageous
19 conduct independent of the CBA.  The court in Cramer declined to
20 preempt an intentional infliction of emotional distress claim after
21 the defendants installed cameras in employee bathrooms in violation of
22 California criminal law.  Id.  The court declined to preempt this
23 claim because the criminal statute imposed a duty that both could not
24 be altered by the CBA and was per se outrageous conduct, regardless of
25 the terms of the CBA.  Id.  Unlike the criminal statute at issue in
26 Cramer, "blacklisting" under Labor Code section 1050, is, in fact,
27 negotiable.  Plaintiffs' claim rests on an allegedly false statement
28 that they violated the terms of their employment contract, the CBA.

1   Employers and employees negotiate the terms of any employment

2   agreement, so the scope of section 1050's falsity requirement is set

3   by the parameters of that agreement.  Only if Plaintiffs can

4   demonstrate that they properly enforced the terms of the CBA can they

5   demonstrate that the Kauper Memo was false.  Therefore, Plaintiffs'

6   intentional infliction of emotional distress claim is preempted and

7   federal jurisdiction exists.

8           4.   <u>Intentional and Negligent Interference with Prospective</u>

9                <u>Economic Advantage</u>

10      To prove a claim for intentional interference with prospective

11  economic advantage, Plaintiffs must prove: (1) Plaintiffs and other

12  companies were in an economic relationship that probably would have

13  resulted in an economic benefit to plaintiffs; (2) Defendants knew of

14  the relationship; (3) Defendants intended to disrupt the relationship;

15  (4) Defendants engaged in wrongful conduct **through misrepresentation**

16  and violation of a statute; (5) the relationship was disrupted; (6)

17  Plaintiffs were harmed; and (7) Defendants' wrongful conduct was a

18  substantial factor in causing Plaintiffs' harm.  (Mot. at 10:10-17

19  (citing <u>Youst v. Longo</u>, 43 Cal. 3d 64, 71 n.6 (1987)) (emphasis

20  added).)  Negligent interference with prospective economic advantage

21  requires proof that: (1) Plaintiffs and other companies were in an

22  economic relationship that probably would have resulted in an economic

23  benefit to Plaintiffs; (2) Defendants knew or should have known of

24  this relationship; (3) Defendants knew or should have known that this

25  relationship would be disrupted if they failed to act with reasonable

26  care; (4) Defendants failed to act with reasonable care; (5)

27  Defendants engaged in wrongful conduct **through misrepresentation** and

28  violation of statute; (6) the relationship was disrupted; (7)

1  Plaintiffs were harmed; and (8) Defendants' wrongful conduct was a
2  substantial factor in causing Plaintiffs' harm. (Id. at 10:18-27
3  (citing North Amer. Chem. Co. v. Superior Ct., 59 Cal App. 4th 764,
4  786 (1997)) (emphasis added).)  Like Plaintiffs' other claims, these
5  claims turn on the Court's determination of whether Plaintiffs failed
6  to enforce the CBA and as a result, whether Defendants made
7  misrepresentations to interfere with Plaintiffs' future economic
8  relationships.

9      Neither of Plaintiffs' cited cases compels a different result.
10 In Sever v. Alaska Pulp Corp., 978 F.2d 1529 (9th Cir. 1992), the
11 employer allegedly blacklisted the plaintiff in retaliation for
12 actions the plaintiff undertook while working.  The employer sought
13 preemption of the plaintiff's intentional interference with
14 prospective economic advantage under the National Labor Relations Act
15 (not the LMRA).  The court declined to preempt the claim because the
16 wrongful conduct on which the plaintiff relied "occurred after the
17 union had been dissolved" and had "absolutely nothing to do with his
18 original employment . . . or even with the terms of his discharge."
19 Id. at 1540 (emphasis in original).  Here, unlike Sever, Plaintiffs'
20 intentional and negligent interference claims rest on the Kauper Memo,
21 which itself rests on Plaintiffs' enforcement of the CBA that was in
22 force at the time.  Moreover, to determine whether a misrepresentation
23 occurred, the Court will have to determine whether Plaintiffs had, in
24 fact, properly enforced the CBA.

25     Similarly, in Sprewell v. Golden State Warriors, 266 F.3d 979,
26 991 (9th Cir. 2001), the court partly declined to preempt an
27 intentional interference claim based upon the employer's efforts to
28 "portray Sprewell in a false and negative light" after the plaintiff's

discharge.   The court noted that the "wrongful conduct" prong of the intentional interference tort "has been defined by California courts as encompassing 'unethical business practices' such as defamation." Id.   However, the court also stated that "any allegation by Sprewell that the NBA's and the Warrior's alleged media communications were 'wrongful' because they violated the CBA would necessarily require an interpretation of that agreement, and thus would be preempted by section 301." Id.   Here, the allegedly "wrongful conduct" could be a violation of section 1050 or defamation or a simple misrepresentation. Yet, as the Court has discussed in detail, these instances of "wrongful conduct" turn on Defendants' alleged false statements that Plaintiffs failed to properly enforce the CBA. In this circumstance, Plaintiffs' interference claims are inextricably intertwined with interpretation and application of the CBA.   Therefore, Plaintiffs' intentional and negligent interference with prospective economic advantage claims are preempted and federal jurisdiction exists.

**III. CONCLUSION**

    The Court holds that Plaintiffs' five state-law claims – all of which turn on the falsity of Defendants' memorandum – are preempted by section 301 of the LMRA.   Therefore, the Court can properly exercise jurisdiction over Plaintiffs' claims and Plaintiffs' motion to remand is DENIED.   Because the Court has denied Plaintiffs' motion, the Court also DENIES their request for attorney's fees.

    **IT IS SO ORDERED.**

    **DATED:     July 23, 2008**

                                        _____
                                        **AUDREY B. COLLINS**
                                        **UNITED STATES DISTRICT JUDGE**